JORDAN V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO.  2-04-549-CR

J.D. JORDAN APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

Introduction

Appellant J.D. Jordan had a shootout with Wichita Falls Police officers in the living room of the home from which Appellant was dealing drugs.  Appellant shot two of the officers and came so close to shooting a third that the bullet passed through the officer’s clothes before Appellant ran out of bullets and surrendered.  A jury convicted him on six counts of attempted capital murder—one for each of the four officers who actually entered the house during the gun battle, and one for each of two officers who remained outside—and assessed punishment at life in prison for each count.  On appeal, Appellant argues that the evidence is legally and factually insufficient to prove (1) that he knew that the six complainants were peace officers and (2) that he intended to kill the two officers who remained outside the house.  We affirm.

Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
See Zuniga v. State
, 144 S.W.3d 477, 481 (Tex. Crim. App. 2004).  The only question to be answered in a factual sufficiency review is whether, considering the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt.  
Id
. at 484.  There are two ways evidence may be factually insufficient:  (1) when the evidence supporting the verdict, considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt; or (2) when there is evidence both supporting and contradicting the verdict or judgment and, weighing all of the evidence, the contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt.  
Id
. at 484-85.  “This standard acknowledges that evidence of guilt can ‘preponderate’ in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt.”  
Id
. at 485.  In other words, evidence supporting a guilty finding can outweigh the contrary proof but still be insufficient to prove the elements of an offense beyond a reasonable doubt.  
Id
.    In performing a factual sufficiency review, we are to give deference to the fact finder’s determinations, including determinations involving the credibility and demeanor of witnesses.  
Id.
 at 481; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  We may not substitute our judgment for the fact finder’s.  
Zuniga, 
144 S.W.3d at 482.  

A proper factual sufficiency review requires an examination of all the evidence.  
Id
. at 484, 486-87.  An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

Summary of the Evidence

Wichita Falls Police Officer Scott Poole, a narcotics investigator, testified that he obtained a knock-and-announce search warrant for Appellant’s home after an informant reported that Appellant was selling marijuana.  Six officers traveled to Appellant’s house to execute the warrant: Poole, Karl King, Chris Taylor, Justin Whisenhunt, 
Larry Robinette, and Kevin Folmar.
(footnote: 2)  Poole testified that he was wearing a department-issued police ball cap, a police “raid” jacket, and a bullet-resistant vest.  The cap was imprinted with the word “police” on the front, and the raid jacket had the word “police” printed on the front and back and a police badge printed on the front.  Officer Poole said that when the officers approached the front door of the house, he opened the screen door, knocked loudly on the wooden door, and yelled, “[P]olice, search warrant.” Officer Poole testified that there was no response, so he knocked and announced a second and a third time.  After a few more seconds, Officer Taylor knocked open the door with two hits from a battering ram.  Officer Poole waited a few seconds for his eyes to adjust from the bright sunlight outside to the relative darkness inside the house, then stepped slowly into the house while shouting, “[P]olice, search warrant.”  As he stepped around the open door, he heard two gunshots, and a bullet hit him in the shoulder.  Officer Poole immediately backed out of the door and onto the porch. 

Officer King testified that Officer Poole waited at least fifteen seconds after banging on the front door and announcing, “Police, search warrant, open the door” before he instructed Officer Taylor to breach the door.  He said that he entered the house just behind Officer Poole.  When Officer Poole was shot, Officer King passed him, and a bullet grazed Officer King’s ear.  Officer King saw the arm of a man shooting a revolver from the home’s hallway and returned fire.  Officer King testified that during the ensuing gun battle, Appellant said, “I give up, I give up, I’m going to give you my gun”—and then fired two more shots at the officers.  

Officer Taylor testified that he ran into the house behind Officer King when the shooting started.  He was wearing a raid jacket like Officer Poole’s and testified that all of the officers were similarly dressed.  He said the lights were off in the living room, but it was “fairly bright inside” from sunlight. Officer Taylor fired all of the rounds in his weapon, then stepped outside to reload during a lull in the gunfight.  When he re-entered the house, he heard Appellant say, “My son’s in here, my son’s in here.”  Officer Taylor told Appellant to drop his weapon; a moment later, Appellant tossed his gun into the living room and walked out from the hallway. 

Officer Robinette testified that he followed Officer Taylor into the house.  He said sunlight was streaming in though the blinds in the living room and he could see Appellant clearly.  During the firefight, Officer Robinette and the other officers continued to yell that they were police.  After Appellant surrendered, Officer Robinette realized that a bullet had passed through his clothing but missed his body. 

Officer Whisenhunt testified that he was on his way into the house when Officer Poole came back out and collapsed on the porch.  He stopped to assist Officer Poole, and a bullet fired from inside the house broke a window a few feet away from them and to the right of the front door.  He testified that he and Officer Poole “most likely would have been visible through that window.” 

Officer Folmar testified that Officer Poole knocked and announced for twenty to twenty-five seconds before instructing Officer Taylor to breach the door, and that Officer Poole has a very loud voice that could have been heard throughout the house.  Officer Folmar took up a position at a window to the left of the front door when the shooting started, and a bullet broke the window where he was standing. 

Appellant’s son testified that he returned home from school thirty minutes before the gunfight.  He said that he was playing a computer game when Appellant entered his bedroom and said, “son, the cops are here.”  Appellant left the bedroom, closing the door behind him.  His son heard an indistinct yell from a voice he did not recognize, and then the shooting started.  He heard Appellant yell, “My son’s in there.”  When the shooting stopped, a police officer escorted Appellant’s son out of the house and handcuffed him.  

Appellant testified in his own defense.  Appellant said that he was worried that his drug-dealing associates or customers were coming to “take my drugs and money away.”  He testified that he was dozing on a love seat in the living room when he heard someone open the house’s storm door.  He looked out the front door’s peephole, grabbed his gun, and went to his son’s bedroom. Appellant did not recall telling his son “the cops were there,” but admitted that it was possible.  Appellant stated that he did not hear anyone saying anything. He heard the front door burst open.  He looked around the corner into the living room and saw a man standing there.  Appellant testified, “I suppose it was [Officer] Poole . . . but when he came in his cap was on backwards -- I noticed that -- and . . . both of us had our eyes locked on one another.”  Appellant said they stared at each other with their guns pointed at one another for a few seconds, and then the shooting started.  Appellant testified, “I’m not going to say I didn’t fire the first shot, I don’t know if I did or didn’t.”  When asked whether he said he would give up and then fired two more shots, Appellant testified, “I’m not going to say I didn’t, I ain’t going to say I did, because I really don’t know.”  Appellant said that he “felt like . . . it had to be the cops” when he saw “a woman standing there.”
(footnote: 3)  Appellant testified that someone said, “Throw your gun down,” and he complied.

On cross-examination, Appellant admitted that, on the day of the gunfight, he gave police a statement
(footnote: 4) in which he said that he realized that his adversaries were police “[s]omewhere in the middle of the shooting” and that he continued to fire his gun after coming to that realization.  Appellant agreed that the officers were wearing raid jackets as described by Officers Poole and Taylor.  Appellant admitted that he told police in his statement that he had expected the police to arrest him as early as the night before the gunfight. 

In the State’s rebuttal case, Officer Poole testified that he was wearing his cap with the police insignia facing forward when he entered the house. 

Discussion

A person commits the offense of capital murder if the person intentionally or knowingly causes the death of a peace officer acting in the lawful discharge of an official duty and whom the person knows is a peace officer.  
Tex. Penal Code Ann.
 §
§19.02(b) (Vernon 2003), 19.03(a) (Vernon Supp. 2005).  A person commits the offense of attempted capital murder if, with specific intent to commit capital murder, he does an act amounting to more than mere preparation that tends but fails to effect the commission of capital murder.  
Id.
 § 15.01(a) (Vernon 2003)
.

In each of his six issues, Appellant argues that the evidence is legally and factually insufficient to prove beyond a reasonable doubt that he knew that each individual officer was a peace officer.  In his fourth and fifth issues, he also argues that the evidence is legally and factually insufficient to prove beyond a reasonable doubt that he intended to kill Officers Folmar and Whisenhunt.  Except for these specific elements, Appellant concedes that the evidence is legally and factually sufficient to support the jury’s verdict.

Viewed in the light most favorable to the verdict, the evidence shows that Appellant expected the police to come and arrest him; that the officers knocked and announced their presence several times before battering down Appellant’s door; that their clothing was distinctive and emblazoned with the word “police” and police emblems; that they continued to identify themselves as police officers throughout the fight; that although the lights were off in the living room, it was nonetheless light enough for Appellant, in his own words, to “lock eyes” with Officer Poole before shooting him; and that Appellant knew they were police officers even before they entered the house because he told his son, “the cops are here.”  We hold that the evidence is therefore legally sufficient to permit a jury to conclude beyond a reasonable doubt that Appellant knew that the officers were peace officers. 
  
Considering the evidence in a neutral light, we hold that it was also factually sufficient.  We therefore overrule Appellant’s first, second, third, and sixth issues, and overrule his fourth and fifth issues in part.

With regard to whether Appellant intended to kill Officers Folmar and Whisenhunt, the two officers who did not enter the house during the shootout, we note that the question of intent to kill is a question of fact for the jury.  
Brown v. State
, 122 S.W.3d 794, 800 (Tex. Crim App. 2003), 
cert. denied
, 541 U.S. 938 (2004).  The jury may infer the intent to kill from the perpetrator’s use of a deadly weapon, unless it would be unreasonable to infer that death or serious bodily injury could result from the use of the weapon.  
Id
. at 800.

The evidence showed that bullets fired from within the house penetrated the two windows near which the officers took positions during the fight.  The facts that Appellant shot repeatedly at the officers who entered the house and managed to hit two and nearly hit one of them strongly suggests that Appellant intended to shoot all of the officers.  We hold that a rational trier of fact could conclude beyond a reasonable doubt that Appellant intended to kill Officers Folmar and Whisenhunt.  The evidence of his intent to kill was therefore legally sufficient.
  Viewed in a neutral light,
 we cannot say that the evidence supporting the verdict, considered by itself, is too weak to support the finding of intent beyond a reasonable doubt, nor that the contrary evidence is so strong that intent cannot be proven beyond a reasonable doubt.  
Thus, the evidence was also factually sufficient.  We therefore overrule the remainder of Appellant’s fourth and fifth issues.

Conclusion

Having overruled all six of Appellant’s issues, we affirm the trial court’s judgment.

ANNE GARDNER

JUSTICE

PANEL B: DAUPHINOT, HOLMAN, and GARDNER, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  June 29, 2006

FOOTNOTES
1:
See 
Tex. R. App. P. 
47.4.

2:
Officer Poole testified that Amy Preston, a college student intern, accompanied the officers. 

3:
The record does not reflect the presence of any woman other than Amy Preston, the student intern, at the scene during the gun battle, and Officers King and Robinette testified that Preston stayed in Officer Robinette’s car during the entire incident.

4:
The statement itself was not offered into evidence.